07-3705-cv
T.P. v. Mamaroneck Union Free Sch. Dist.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

--------

August Term, 2008

(Argued: December 2, 2008          Decided: February 3, 2009)

Docket No. 07-3705-cv

------------------------------------------------------------X

T.P. and S.P., on behalf of S.P.,

Plaintiffs-Appellees,

- v. -

MAMARONECK UNION FREE SCHOOL DISTRICT,

Defendant-Appellant.*

------------------------------------------------------------X

Before:    JACOBS, Chief Judge, McLAUGHLIN and B.D. PARKER,
           Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York (Brieant, J.) granting summary judgment to Plaintiffs-Appellees on their claim for reimbursement of educational expenses under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. We hold that Plaintiffs-Appellees have failed to show that Defendant-Appellant's educational plan for their autistic child was improperly predetermined, and that the district court erred in

---

* The Clerk of the Court is directed to amend the official caption as set forth above.

failing to defer to the administrative experts who found that the plan adequately addressed the child's transition into the kindergarten classroom.

REVERSED and REMANDED.

GARY S. MAYERSON, Mayerson & Associates, New York, NY, for Plaintiffs-Appellees.

MARK C. RUSHFIELD, Shaw, Perelson, May & Lambert, LLP, Highland, NY, for Defendant-Appellant.

PER CURIAM:

The Mamaroneck Union Free School District ("Mamaroneck") appeals from a grant of summary judgment to Plaintiffs T.P. and S.P. by the United States District Court for the Southern District of New York (Brieant, J.). T.P. and S.P. sued under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., seeking reimbursement for educational services they provided for their autistic child.

T.P. and S.P. objected to Mamaroneck's plan for special-education services for their son S.P.'s kindergarten year. They requested an administrative hearing to obtain reimbursement for additional services they deemed necessary. After a hearing, an Impartial Hearing Officer ("IHO") denied their claim, and a State Review Officer ("SRO") affirmed. S.P.'s parents then pursued their claim in the United States District Court for the Southern

2

District of New York. The district court held that Mamaroneck had violated both the procedural and substantive requirements of the IDEA. Accordingly, it granted summary judgment to the parents and awarded them reimbursement, as well as attorneys' fees and costs.

We reverse and remand with instructions to enter judgment in Mamaroneck's favor.

**BACKGROUND**

S.P. is an autistic child who attends school in Mamaroneck. Because of his disability, S.P. was entitled under the IDEA to a "free appropriate public education" administered by Mamaroneck according to an "Individualized Education Program" ("IEP"). See 20 U.S.C. §§ 1412(a)(1)(A), 1414(d).

In 2003-2004, S.P. attended a regular-education preschool for 10 hours per week, where he was accompanied by a personal aide. At home, S.P. received 30-35 hours of applied behavioral analysis ("ABA") therapy per week, 5 hours of ABA "supervision," and speech and occupational therapy. ABA is a set of educational principles used to increase or decrease behaviors. Mamaroneck funded these services pursuant to a settlement agreement after S.P.'s parents disagreed with Mamaroneck's proposed IEP.

In January 2004, Mamaroneck's Committee on Special Education (the "Committee"), which included S.P.'s parents, began

3

considering S.P.'s transition into the school district for kindergarten. The Committee discussed reevaluating S.P. to aid it in making recommendations for his IEP, and agreed to observe him at his preschool and then reconvene to discuss transition options. A behavioral consultant retained by Mamaroneck, Susan Young, visited S.P.'s preschool and administered tests in May 2004. Young also interviewed S.P.'s mother, teacher, and speech therapist. In her report, Young recommended that S.P. attend a special-education kindergarten class. Young noted that S.P. did not require the intensive instructional services of the autistic population, for example ABA, though she recommended that speech and occupational therapy continue.

In June 2004, the Committee met to discuss S.P.'s IEP for 2004-2005. The Committee's recommendations included placement in a 12-student special-education class with a teacher and two assistants, speech therapy three times per week in a group and once individually, and individual occupational therapy two times per week.

After the June meeting, the McCarton Center for Developmental Pediatrics, which had been retained by S.P.'s parents, issued a report containing recommendations contrary to those in Young's report. The McCarton Center recommended that S.P. attend a special-education class where he was to be

accompanied by a full-time personal aide.  It also recommended that S.P. continue receiving ABA at home, including 25 hours per week of ABA therapy, as well as private speech and occupational therapy five times each per week.

At the parents' request, the Committee reconvened in July 2004 to review the McCarton report and to continue discussing S.P.'s IEP.  Though Mamaroneck's consultant, Young, was invited to the meeting and went to the location that morning, she did not attend.  Instead, in the hour before the meeting, she reviewed the McCarton report in the Committee chairperson's office. Young's notes of her review include a two-column chart comparing McCarton's recommendations with her own, which she labeled "School Respon."  Where McCarton recommended 25 hours of at-home ABA, Young recommended 10 hours of in-school ABA; where McCarton recommended that a full-time personal aide be provided to S.P. at school, Young recommended a part-time personal aide to provide the in-school ABA; and where McCarton recommended five sessions each of private speech and occupational therapy per week, Young recommended, respectively, four and two.

During the meeting, S.P.'s parents expressed concern about his transition to a full-day kindergarten program, and requested that Mamaroneck continue providing at-home ABA.  The parents also requested that Mamaroneck provide S.P. with a full-time personal

5

aide during school, that Mamaroneck staff observe S.P. over the summer and meet with his home providers, and that his home providers be allowed to attend school at the beginning of the year to assist with his transition and train Mamaroneck staff. The Committee agreed to have Young observe S.P. and communicate with the home providers over the summer, and to provide training to Mamaroneck staff. However, Young would provide the training and not S.P.'s home providers. The Committee denied the parents' request for at-home ABA and a full-time personal aide, and instead recommended, consistent with Young's premeeting notes and in addition to the programs recommended at the June meeting, 10 hours of in-school ABA to be provided by a part-time personal aide. The Committee's recommendations were adopted in the IEP, which also provided for a team meeting the first week of school and continuing team meetings during the school year, including meetings with S.P.'s home providers.

The parents objected to the IEP on the ground that it was insufficient to provide a free appropriate public education to S.P. They therefore supplemented the IEP with at-home services, including 25 hours of ABA therapy and five hours of individual speech therapy per week, and requested an administrative hearing to obtain reimbursement from Mamaroneck for the cost of these services.

S.P. began attending the special-education kindergarten class in September 2004.  At the beginning of the school year, S.P. attempted to bite others on approximately six occasions.  The biting ended in October.  S.P. was also "scripting," which involved the off-topic use of language usually about television shows as a calming or avoidance technique.  At the parents' request, Mamaroneck instituted a system for reducing S.P.'s scripting, and the scripting subsided in the first few months of school.

An IHO held a hearing on the parents' request for reimbursement between January and May 2005.  The parents challenged Mamaroneck's IEP on numerous grounds, including that Mamaroneck (1) improperly predetermined S.P.'s IEP by (a) agreeing upon educational placements before the July Committee meeting and (b) developing educational placements before goals and objectives; and (2) failed to provide appropriately for S.P.'s transition into the kindergarten classroom.

During the hearing, witnesses testified inconsistently about the extent to which the Committee discussed goals and objectives for S.P. during the June meeting.  They agreed, however, that programs and placements, and some speech and language goals, were discussed.  Young testified that she was unable to attend the July Committee meeting because of a scheduling mistake.  She

noted that "School Respon." in her premeeting notes meant "school responsibility." Young did not recall discussing her recommendations with the Committee chairperson before the meeting, and testified that the chairperson was on the phone and attending to other business when Young was reviewing the McCarton report in the chairperson's office. The chairperson testified that she obtained Young's "input into what some of the new recommendations could be" before the meeting. However, both Young and the chairperson testified that there was no premeeting agreement to adopt Young's recommendations.

At the conclusion of the hearing, the IHO rejected the parents' arguments and denied their claim for reimbursement.

The parents appealed to an SRO, who affirmed. The SRO found that while Young may have shared her thoughts with Committee members before the July meeting, this did not demonstrate that Mamaroneck impermissibly predetermined S.P.'s IEP. Nor could the SRO conclude that educational placements were finalized before goals and objectives were developed, given that both were discussed at the June meeting, and placements were modified at the July meeting in response to the parents' concerns. The SRO also found that Mamaroneck appropriately planned for S.P.'s transition to the classroom by providing supports and services designed to ease S.P.'s transition, and that the biting and

8

scripting that occurred in the first few months of school did not impede S.P.'s learning.

The parents pursued their claim in the district court, which granted them summary judgment. Disagreeing with the IHO and SRO, the district court found that the 2004-2005 IEP was procedurally and substantively deficient because Mamaroneck predetermined the ABA services it was willing to provide to S.P. in 2004-2005, made placement recommendations before finalizing S.P.'s goals and objectives, and failed to appropriately address S.P.'s transition into kindergarten by not providing at-home ABA services. The district court further found that reports from 2005 indicated S.P. had regressed in certain areas, and though it found that the reports were not outcome determinative, they confirmed that the 2004-2005 IEP was insufficient.[1] Accordingly, the district court awarded the parents reimbursement for the cost of the additional services they provided S.P., and attorneys' fees and costs.

Mamaroneck now appeals.

## DISCUSSION

---

[1] Mamaroneck charges error in the district court's consideration of 2005 reports. This Court has never ruled on whether district courts may consider retrospective evidence in assessing the substantive validity of an IEP. See D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 599 (2d Cir. 2005) (remanding for the district court to consider the issue in the first instance). We need not do so here, as resolution of the issue is unnecessary to our disposition of this case.

We review de novo the district court's grant of summary judgment in an IDEA case. Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005). Summary judgment in this context involves more than looking into disputed issues of fact; rather, it is a "pragmatic procedural mechanism" for reviewing administrative decisions. Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks omitted).

"[T]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007) (internal quotation marks omitted). While the district court must base its decision "on the preponderance of the evidence," 20 U.S.C. § 1415(i)(2)(C)(iii), it "must give 'due weight' to [the administrative] proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy,'" Gagliardo, 489 F.3d at 113 (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206, 208 (1982)). Thus, district courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206.

10

To receive federal funding under the IDEA, states are required to provide disabled children with a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A). Parents who believe that the state has failed to provide such an education may pay for private services and seek reimbursement from the school district for "expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." Sch. Comm. of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 370-71 (1985).

To determine whether parents are entitled to tuition reimbursement, we engage in a three-step process. Cerra, 427 F.3d at 192. First, we examine whether the state has complied with the procedures set forth in the IDEA. Id. Second, we consider whether the proposed IEP is substantively appropriate in that it is "'reasonably calculated to enable the child to receive educational benefits.'" Id. (quoting Rowley, 458 U.S. at 206-07). Only if the IEP is procedurally or substantively deficient do we reach the third step and ask whether the private schooling obtained by the parents is appropriate to the child's needs. Id. In fashioning relief, "'equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant.'" Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363-64 (2d Cir. 2006)(alteration in original)(quoting Burlington,

11

471 U.S. at 374).  As the party commencing the administrative review, the parents bear the burden of persuasion as to the inappropriateness of Mamaroneck's IEP and the appropriateness of the private services.  Gagliardo, 489 F.3d at 112.

I.    Procedural Compliance

The initial procedural inquiry in an IDEA case "is no mere formality," as "'adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.'" Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998) (quoting Rowley, 458 U.S. at 206).  In considering whether Mamaroneck satisfied the procedural requirements of the IDEA, "we focus on whether the [parents] had an adequate opportunity to participate in the development of [the] IEP." Cerra,  427 F.3d at 192.

Here, the parents argue that Mamaroneck predetermined educational programs for S.P. in violation of the procedural requirements of the IDEA by: (1) adopting programs for S.P.'s IEP before the July Committee meeting, and (2) making placement recommendations before finalizing S.P.'s goals and objectives. These arguments fail.

First, Mamaroneck's consideration of educational programs for S.P. before the July Committee meeting did not violate the

12

procedural requirements of the IDEA. The parents contend that the Committee chairperson repeated Young's premeeting recommendations at the meeting and therefore must have discussed them with Young before the meeting. Even if there was such discussion, this does not mean the parents were denied meaningful participation at the meeting. IDEA regulations allow school districts to engage in "preparatory activities . . . to develop a proposal or response to a parent proposal that will be discussed at a later meeting" without affording the parents an opportunity to participate. See 34 C.F.R. §§ 300.501(b)(1) & (b)(3).[2] Mamaroneck's conduct was consistent with these regulations.

The parents argue, however, that Young's notes delineated the limits of the services Mamaroneck was willing to provide, and therefore under Deal ex rel. Deal v. Hamilton County Board of Education, 392 F.3d 840 (6th Cir. 2004), Mamaroneck denied them meaningful participation in the IEP process by improperly predetermining S.P.'s educational program. Though not bound by Deal, we find it distinguishable. In Deal, the school district had consistently rejected parent requests for intensive ABA and told the parents that "the powers that be" were not implementing such programs. Id. at 855-56. Because the school district did

---

[2] At the time of the relevant events in this case, these provisions were found in 34 C.F.R. §§ 300.501(a)(2)(i) & (b)(2).

not have an open mind as to whether intensive ABA programs might be appropriate in some cases, the court found that the parents were denied meaningful participation in the IEP process. Id. at 857-58.

S.P.'s parents have failed to show that Mamaroneck did not have an open mind as to the content of S.P.'s IEP. Both Young and the Committee chairperson testified that there was no premeeting agreement to adopt Young's recommendations. There is also evidence that the parents meaningfully participated in the July meeting, for example the Committee's adoption in the IEP of the parents' recommendations that Mamaroneck staff observe S.P. over the summer and meet with his home providers, and that Mamaroneck staff receive training on how to educate S.P. We find that the parents meaningfully participated in the development of S.P.'s IEP, and Mamaroneck's premeeting consideration of programs for S.P. did not violate the procedural requirements of the IDEA.

Second, the timing of placement recommendations did not violate the procedural requirements of the IDEA. The record is unclear as to the extent goals and objectives were discussed at the June meeting. However, witnesses agreed that there was discussion of speech and language goals as well as placement recommendations. Moreover, S.P.'s programs were later modified in response to the McCarton report and the parents' concerns

14

about transition. Thus, the parents have failed to show that placements and programs were finalized before goals and objectives.

II.  Substantive Adequacy

"[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." Cerra, 427 F.3d at 195 (internal quotation marks omitted).  School districts are not required to "furnish[] every special service necessary to maximize each handicapped child's potential." Rowley, 458 U.S. at 199.

The district court found S.P.'s 2004-2005 IEP substantively inadequate because S.P. had previously received at-home ABA but the IEP provided none, and thus the IEP failed to appropriately account for S.P.'s transition into the kindergarten classroom. We conclude that in finding the IEP substantively inadequate, the district court failed to defer appropriately to the decisions of the administrative experts on a difficult question of educational policy: how best to transition an autistic child from a primarily home-based educational program to a school-based program. See Gagliardo, 489 F.3d at 112-13.

As the SRO and IHO found, the IEP included numerous supports

15

and services to assist S.P. with his transition. It included 10 hours of in-school ABA. The IEP specified that Young would observe S.P. over the summer and communicate with his home providers in order to develop an appropriate in-school program. There was to be a team meeting the first week of school and continuing team meetings during the school year, including meetings with the home providers. Though S.P. did engage in biting and scripting at the beginning of the school year, Mamaroneck adopted the parents' recommendation to institute a system for decreasing the scripting. The system was effective, and S.P.'s biting ended in October. The SRO found that the biting and scripting did not impede learning. We find the administrative decisions to be "reasoned and supported by the record," and therefore defer to the findings of the SRO and IHO that the IEP appropriately provided for S.P.'s transition. See Gagliardo, 489 F.3d at 1132-13.

Because we find that S.P.'s 2004-2005 IEP was neither procedurally flawed nor substantively deficient, we need not reach the issues whether the additional services provided by the parents were appropriate, see Cerra, 427 F.3d at 192, or whether equitable considerations affect relief, see Frank G., 459 F.3d at 363-64.

We have reviewed the parents' other challenges to the IEP

16

and find them to be without merit.

## CONCLUSION

For the foregoing reasons, we REVERSE the judgment and REMAND to the district court with instructions to enter judgment for Mamaroneck.